# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

GURU FOOD LLC,

            Plaintiff,

     v.                                Case No. 20-CV-1625

UNITED STATES OF AMERICA,

            Defendant.

# ORDER

Plaintiff Guru Food LLC brought this action for judicial review of the Food and Nutrition Service's (FNS) final agency decision to permanently disqualify Guru Food from participation in the Supplemental Nutrition Assistance Program (SNAP). Defendant the United States of America filed a motion for summary judgment on June 30, 2022. (ECF No. 23.) On July 13, 2022, Guru Food filed its own motion for partial summary judgment. (ECF No. 35.) Those motions are now fully briefed and ready for resolution. Both parties have consented to the jurisdiction of this court. (ECF Nos. 6, 8.)

## 1. Background

### 1.1. Regulatory Background

In 1964 Congress established what was at the time called the Food Stamp Program. *Fells v. United States*, 627 F.3d 1250, 1252 (7th Cir. 2010) (citing The Food Stamp Act of 1964, Pub. L. No. 88-525, 78 Stat. 703 (1964)). "It aims both to feed low-income individuals and strengthen the nation's agricultural economy, … and authorizes the Secretary of Agriculture to promulgate regulations to implement the program[.]" *Id.* (citing 7 U.S.C. §§ 2011, 2013(c), 2021(a)(2)). In 1996 Congress set a deadline for states to replace the paper coupons that were used for Food Stamps with Electronic Benefit Transfer (EBT) systems, "which use debit-type cards to deduct benefits from a central location." *Id.* (citing 7 U.S.C. § 2016(h)). In 2008 Congress changed the name of the program to the Supplemental Nutrition Assistance Program. *Id.* (citing Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-234, § 4001(b), 122 Stat. 923, 1092 (2008)).

Once a month a SNAP recipient's EBT card is credited with SNAP benefits in the amount in which he or she is eligible. *Hajifarah v. United States*, 779 F. Supp. 2d 191, 194 (D. Me. 2011). SNAP recipients may only redeem SNAP benefits for food items at retail stores that are approved for program participation. *See* 7 U.S.C. § 2013(a). To purchase qualifying food, an individual SNAP beneficiary swipes his or her EBT card through a point-of-service (POS) device and enters a personal identification number (PIN) on a keypad. *Savera Super Store, LLC v. United States*, No. 14-CV-554, 2016 WL 55274, at * 2

(D.N.H. Jan. 5, 2016). The amount of the purchase is deducted from the beneficiary's SNAP account and credited to the store. *Id.* Each EBT transaction is electronically recorded, and shows the date and time of purchase, the amount of purchase, and the EBT card number. *Id.*

For a business to participate as an authorized retailer in SNAP, the business owner must complete and sign a SNAP Application for Retail Stores (the "SNAP Retailer Application"). 7 U.S.C. § 2018(a). By signing the SNAP Retailer Application the business owner attests that he or she read, understood, and agreed with the conditions of participation in SNAP. (Administrative Record (A.R.) at 19-20.) The conditions of participation include that the business owner will ensure all SNAP training materials are reviewed and followed by store employees; awareness that violations of SNAP rules can result in administrative actions against the business, including disqualification from SNAP; and that the business owner accepts responsibility on behalf of the business for violations of SNAP regulations, including those committed by any of the business's employees. (A.R. at 19-20.)

SNAP is administered by the Food and Nutrition Service division of the United States Department of Agriculture. 7 U.S.C. § 2011; 7 C.F.R. § 271.3. FNS may disqualify participating stores for improper use of benefits, including "trafficking" benefits, which is defined as "the buying, selling, stealing, or otherwise effecting an exchange of SNAP benefits … for cash or consideration other than eligible food." 7 C.F.R. § 271.2. Title 7

3

U.S.C. § 2021(b)(3)(B) provides that a store shall be disqualified permanently for its first trafficking offense. However, in lieu of permanent disqualification, the regulations provide that FNS "may impose a civil monetary penalty [(CMP)] … in accordance with the provisions of § 278.6(i) and 278.6(j)." *See* 7 C.F.R. § 278.6(a). According to § 278.6(i), to be eligible for a CMP a food store must "at a minimum" establish "by substantial evidence" four criteria:

Criterion 1. The firm shall have developed an effective compliance policy as specified in § 278.6(i)(1);

Criterion 2. The firm shall establish that both its compliance policy and program were in operation at the location where the violation(s) occurred *prior* [emphasis in original] to the occurrence of violations cited in the charge letter sent to the firm;

Criterion 3. The firm had developed and instituted an effective personnel training program as specified in § 278.6(i)(2); and

Criterion 4. Firm ownership was not aware of, did not approve, did not benefit from, or was not in any way involved in the conduct or approval of trafficking violations ….

Pursuant to § 278.6(b)(2)(i), a food store requesting a CMP in lieu of permanent disqualification must submit the material specified in § 278.6(i) ten days from the receipt of the "charge letter" from FNS specifying the violations.

FNS maintains a national database documenting each EBT transaction at every store participating in the SNAP program. *Almonte Mkt. v. United States*, No. 18-CV-30035, 2020 WL 93994, at *2 (D. Mass. Jan. 8, 2020). FNS uses the "Anti-Fraud Locator Using Electronic Benefit Retailer Transactions" (ALERT) computer program, designed to

monitor and ensure retail compliance. *Id.* The ALERT program identifies statistically unusual EBT transaction patterns to target possible fraud or trafficking of benefits. *Id.* Based on the results of an ALERT report, FNS may open an administrative case, investigate a store, and take enforcement actions as authorized under SNAP. 7 C.F.R. §§ 278, 279; 7 U.S.C. § 2023.

### 1.2. Factual Background and Procedural History

Guru Food is a convenience store located at 4028 West Lisbon Avenue in Milwaukee, Wisconsin. (ECF No. 30 at ¶ 1.) Mamta Singh is Guru Food's sole owner and manager. (ECF No. 30 at ¶ 8.) As owner and manager, Singh oversees all aspects of the business' operations and works a daily shift as a cashier. (ECF No. 30 at ¶¶ 9, 10.)

Guru Food has been a SNAP participant since 2014. (ECF No. 46 at ¶ 2.) The store has approximately 925 square feet of retail space, one cash register, and one POS device, but no optical scanners, shopping carts, or shopping baskets. (ECF No. 30 at ¶ 30.) Guru Food's EBT policy with respect to its compliance with the SNAP regulations was printed and displayed on a placard which hung on the outside of the window separating the cashier from store customers. (ECF No. 46 at ¶ 6.)

From 2016 to 2021 Halim Halimey worked at Guru Food as a cashier. (ECF No. 30 at ¶ 35.) Singh's husband and sister also frequently work and perform various duties at the store. (ECF No. 30 at ¶ 36.) Singh explained the store's EBT policy to Halimey prior

to his first shift and explained that violating the policy could result in discipline or termination. (ECF No. 46 at ¶ 7.)

In March 2020 Guru Food appeared on the EBT ALERT system as having patterns consistent with trafficking. (A.R. at 168.) FNS analyzed Guru Food's EBT SNAP transaction data for the months of September 2019 through February 2020 (the "review period"). (A.R. at 168.) On December 16, 2019, FNS sent an independent contractor to Guru Food to perform a store inspection during which the contractor photographed the store's interior and exterior, observed product inventory, stock, pricing, the checkout area, and store capabilities. (A.R. at 128-45.)

On reviewing the contractor's findings and Guru Food's EBT data, FNS identified repetitive and unusually large transactions from the same households within a narrow timeframe. (A.R. at 174-75.) Based on these transactions, the store's characteristics, and its recorded food stock, FNS concluded that trafficking was likely occurring at Guru Food. (A.R. at 174-85.)

On April 9, 2020, FNS sent to Guru Food a "Charge Letter," which formally charged it with trafficking SNAP benefits and provided Guru Food with a list of SNAP transactions that "establish[ed] clear and repetitive patterns of unusual, irregular, and inexplicable activity for [Guru Food's] type of firm." (ECF No. 1-2 at 1.) The Charge Letter also informed Guru Food that it would be permanently disqualified from further participation in SNAP pursuant to 7 C.F.R. § 278.6(e)(1) if it was determined it had

committed the trafficking violations with which it was charged. (ECF No. 30 at ¶ 53 (ECF No. 1-2 at 1.) The Charge Letter also explained that, under certain conditions, FNS may impose a CMP in lieu of permanent disqualification and provided Guru Food with the list of criteria outlined 7 C.F.R. § 278.6(i) that it must meet with ten calendar days of receipt of the Charge Letter if it wished to avoid permanent disqualification from SNAP. (ECF No. 1-2 at 1.)

On April 23, 2020, Guru Food, through counsel, responded to the Charge Letter by submitting an affidavit from Mamta Singh, which in part sought to establish Guru Food's eligibility for a CMP. (ECF No. 30 at ¶ 55.) A couple of weeks later, on May 8, 2020, Guru Food, again through counsel, further responded to the Charge Letter by submitting a letter which, among other things, laid out the procedure by which Halimey provided EBT credit to regular store customers. (A.R. at 208-12.) On May 29, 2020, FNS issued a written response, notifying Guru Food that the acceptance of SNAP benefits for items sold as credit is a violation of 7 C.F.R. § 278.2(f), and requested specific documentation to prove the credit charges. (ECF No. 30 at ¶ 57.) On June 11, 2020, Guru Food, again through counsel, submitted a second affidavit from Singh as well as an affidavit from Halimey. (ECF No. 30 at ¶ 58.) The details of what those affidavits said are discussed in the analysis below.

On July 23, 2020, FNS issued a "Determination Letter" notifying Guru Food that it had concluded the violations cited in the Charge Letter had in fact occurred. (A.R. at 261-

62.) The Determination Letter permanently disqualified Guru Food from participation in SNAP and stated it was not eligible for a CMP because it had failed to submit sufficient evidence to demonstrate that it had established and implemented an effective compliance policy and program to prevent SNAP violations. (A.R. at 261-62.)

On July 29, 2020, Guru Food requested administrative review of the FNS determination. (A.R. at 271-72.) In support of its request Guru Food submitted three letters from regular customers to whom Guru Food extended EBT credit. (A.R. at 277-83.) In the three identical letters the customers explain the process by which Halimey provided them with store credit at times when they had insufficient EBT funds, that they only ever used their EBT cards for SNAP-eligible food items, and how they rely on Guru Food as a SNAP retailer given its location and food variety. (A.R. at 281-83.)

On September 28, 2020, FNS issued a Final Agency Decision reaffirming that there was sufficient evidence to permanently disqualify Guru Food from further participation in SNAP. (A.R. at 291-304.) On October 28, 2020, Guru Food commenced this action, challenging its disqualification from SNAP. (ECF No. 1.)

## 2.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict

for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In resolving cross-motions for summary judgment, the court views each motion "separately in the sense that for each motion, factual inferences are viewed in the nonmovant's favor." *Wilson v. Baptiste*, No. 13 CV 07845, 2016 WL 3878125, at *2 (N.D. Ill. July 18, 2016) (citing *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 603 (7th Cir. 2015)). The controlling question is whether the evidence as a whole—taken from both motions— "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Davis v. Time Warner Cable of Se. Wis., L.P.*, 651 F.3d 664, 671 (7th Cir. 2011) (reviewing cross-motions for summary judgment); *see also Bloodworth v. Village of Greendale*, 475 F. App'x 92, 95 (7th Cir. 2012*); Smart v. Int'l Brotherhood of Elec. Workers, Loc. 702*, 453 F. App'x 650, 653-54 (7th Cir. 2011).

### 3.  Analysis

The United States argues that FNS's finding that Guru Food had engaged in the trafficking of SNAP benefits was supported by "overwhelming" evidence. The United States further argues that permanently disqualifying Guru Food from SNAP was the proper penalty because Guru Food failed to rebut the trafficking charge and failed to demonstrate that it had implemented an effective SNAP compliance policy prior to the violations.

Guru Food argues that it has not engaged in trafficking but that one of its employees, unbeknownst to Singh, had extended credit to regular customers, and that

any other suspicious transactions resulted from customers sharing their EBT cards with friends and/or family members, or selling their benefits. In the event the court does find that the store had engaged in trafficking, Guru Food argues it was eligible for a CMP, and that it was arbitrary and capricious for FNS to permanently disqualify it from SNAP.

### 3.1. Trafficking Determination

FNS's conclusion that Guru Food engaged in trafficking is based on three classes of "suspicious" transactions which occurred during the review period: (1) large (defined as a transaction totaling over $32.00) "back-to-back transactions" with the same customer (*i.e.*, multiple large transactions occurring in rapid succession—likely within one store visit); (2) large "repeat transactions" with the same customer (*i.e.*, large transactions occurring in a 24-hour timeframe—likely across more than one store visit); and (3) an excessive number of large transactions (*i.e.*, 164 transactions each totaling over $32.00). (A.R. at 174-75.)

FNS found that these classes of transactions indicate trafficking, in part because they were inconsistent with Guru Food's store characteristics—namely, its small size; its "marginal stock with limited variety and quantity of SNAP eligible items"; the presence of only one scanner, one POS device, and a plexiglass partition between the cashier and customer—which forces "the customer to physically show the price of each item … to the cashier in order for the cashier to ring the item up"—but no optical scanner, shopping carts, or shopping baskets; and the vast majority of "the store's stock being inexpensive

food items" with no "promotional pricing, special or package items, and [] no bulk or wholesale sales." (A.R. at 174-75; 297.)

FNS noted that these classes of transactions were also inconsistent with transactions typical of other convenience stores nearby and throughout Wisconsin during the review period. FNS found that "the average Convenience Store purchase transaction amount during the review period was $7.50" but that Guru Food, "[d]uring that same period, had 164 transactions … higher than 85% of all Convenience Store purchase transactions." (A.R. at 175.) FNS further found that there were "37 other SNAP authorized stores within a 1-mile radius of Guru, including 27 other convenience stores" but that Guru Food "ha[d] a 140.76% greater average transaction than the Milwaukee County average for a store of its type." (A.R. at 176-77.) FNS determined that trafficking likely explained why Guru Food's SNAP redemption patterns significantly differed from similar-sized competitors nearby. (A.R. at 298-300.)

Also, as a part of its investigation, FNS examined "the shopping and EBT redemption patterns of five individual SNAP households that generated suspicious transaction patterns" at Guru Food. (A.R. at 181.) The examinations revealed that all five SNAP households shopped at larger and better stocked stores during the review period while also making large purchases at Guru Food, often on the same day. (A.R. at 181-85.) FNS questioned "why [] these households [would] choose to spend such large amounts of their limited SNAP allotment at this sparsely stocked convenience store when they had

just visited a better-stocked and more competitively priced grocery store ...?" (A.R. at 181.) FNS concluded it was "likely that the grocery store … transactions represented legitimate food purchases whereas the transactions at [Guru Food] may have represented trafficking." (AR at 181.)

Guru Food insists that innocent explanations account for the flagged transactions. It relies on Halimey's testimony to explain the large "back-to-back" transactions. Halimey testified that he would often extend store credit to regular customers who lacked EBT funds during a store visit with their promise that they would return to the store and place a make-up EBT payment once their SNAP benefits were replenished. (ECF No. 42 at 2.) Often after paying off their make-up EBT payments the customers would make new purchases, resulting in "back-to-back" EBT transactions. (ECF No. 42 at 3.)

As for the large "repeat" transactions, or those made by the same household within a 24-hour period but not "back-to-back," Singh attests that "it is common for a holder of an EBT card to lend it to other family members" and that she "often see[s] various members of one household come into the Store over the span of a day and make EBT purchases with the same card." (ECF No. 43 at ¶¶ 4-5.) "Thus, although it may appear to be 'suspicious' or 'uncommon'" to FNS, "it would not be unusual that several transactions on the same EBT card would occur within a relatively short period of time." (ECF No. 42 at 4.)

As for the "large dollar transactions," Singh and her husband each attest that they have "been the cashier numerous times when a customer has purchased several higher priced items and the amount of the EBT purchase totaled between $60.00 and $100.00." (ECF No. 42 at 5 (citing ECF Nos. 43 at ¶ 6; 44 at ¶ 4).) Guru Food also points out that the United States' proposed material facts state that the store had in stock "ten units of infant formula" priced "at $20.99 per can," "two units of breakfast sausage" priced "at $10.99 a box," "three units of Red Hot Wings" priced "at $7.49 a bag," "and five boxes of Bone-In Wings" priced "at $6.49 a box." (ECF No. 30 at ¶ 34.) Given these prices, and the fact that the store's "quantity of individual items of inventory can be higher or lower at any given time, depending on the dates of delivery" (ECF No. 43 at ¶ 7), Guru Food argues the United States' "assertion that it is not plausible for a customer to purchase expensive items at a store of [Guru Food's] kind and size" is simply mistaken (ECF No. 42 at 5). It adds that "many [of its customers] … are not necessarily sensible shoppers" and that FNS's conclusions demonstrate "a lack of understanding of the shopping needs and habits of low-income households in the inner city," who often "do not shop at a larger grocery store at which the cost of items may be cheaper … because they do not have transportation and are simply unwilling to take a bus." (ECF No. 42 at 5-6.)

A district court reviews *de novo* an administrative finding that a retailer has committed an EBT trafficking violation. *McGlory v. United States*, 763 F.2d 309, 311 (7th Cir. 1985) (per curiam). The court reviews the record before the court, not the record that

was before the agency. *Id*. ("The record in the district court, not the record before the agency, is what counts.").

"When determining whether a store owner has trafficked in food stamps, the agency may rely on 'facts established through on-site investigations, inconsistent redemption data, or evidence obtained through a transaction report under an electronic benefit transfer system.'" *Fells v. United States*, 627 F.3d 1250, 1252-53 (7th Cir. 2010) (quoting 7 U.S.C. § 2021(a)(2)); *see also* 7 C.F.R. § 278.6(a). The plaintiff "bears 'the burden of proving, by a preponderance of the evidence, that the agency's determination was invalid.'" *Tony's Pantry Mart Inc. v. United States*, No. 15-C-2967, 2017 WL 51484, at *4 (N.D. Ill. Feb. 8, 2017) (quoting *Fells*, 627 F.3d at 1253); *see also Onukwugha v. United States*, No. 11-CV-907, 2013 WL 1620247, at *5 (E.D. Wis. Apr. 12, 2013) ("[T]he burden is on [the retailer] to prove by a preponderance of the evidence that this pattern of suspicious transactions is not the result of trafficking.").

"This does not necessarily require [the retailer] to produce a detailed explanation as to the facts and circumstances of every transaction"; rather, "a single business practice might explain away an entire class of suspicious transactions." *Onukwugha*, 2013 WL 1620247, at *5. However, "the plaintiff cannot rely on 'general statements about customers' shopping patterns or other customer practices." *Shanaa v. United States*, No. 15-CV-42, 2017 WL 2838150, at * 3 (E.D. Wis. June 30, 2017) (quoting *Tony's Pantry Mart Inc.*, 2017 WL 514184, at *5).

Halimey's testimony about his practice of extending credit to regular customers is sufficient to raise a genuine issue of material fact as to whether the back-to-back transactions were instances of SNAP benefit trafficking. *See Onukwugha*, 2013 WL 1620247, at *5. When taking this testimony as true, and all reasonable inferences in Guru Food's favor, it is plausible that the cardholding customers to whom Halimey extended credit would pay off their owed balance when they returned to make subsequent purchases, all within a single shopping trip.

But Guru Food does not argue that this practice of extending credit accounts for the large repeat transactions by the same EBT cardholder which occurred within a 24-hour timeframe but across multiple shopping trips. And Guru Food's offered explanation that EBT cardholders often lend their cards to family and friends or sell their benefits to third parties is simply a "general statement[] about … customer practices [which] are not enough to create a triable issue of fact." *Tony's Pantry Mart Inc.*, 2017 WL 5141184, at *5 (quoting *Rockland Convenience Store v. United States*, No. 10-CV-260, 2011 WL 5120410, at *8 (D.N.H. Oct. 27, 2011)).

Mr. and Ms. Singh's testimony that they routinely rang up large purchases while tending the cash register is also not sufficient to overcome FNS's determination that the frequency of large-dollar transactions at Guru Food, which were often also repeat transactions, is indicative of trafficking. FNS found that Guru Food had an average transaction amount 140.76% greater than the Milwaukee County average for convenience

stores and was "redeeming 175.93% more than the Milwaukee County average for a convenience store" yet had "no price advantage, profusion of ethnic goods, or special/custom services rendered that could reasonably explain the substantially above average percentages." (A.R. at 177-78.)

FNS also examined five households which had generated "suspicious" transaction patterns at Guru Food and found that all five also "shopped at larger, better stocked stores." (ECF No. 30 at ¶ 25 (citing A.R. at 181).) Guru Food's vague assertions—*i.e.*, that FNS is unfamiliar with the shopping habits of low-income, inner-city residents, and that many of its customers are not "sensible shoppers" and do not shop at larger, less expensive stores because they lack transportation and/or will not take the bus (ECF No. 42 at 5-6)—are not specific enough to rebut FNS's finding that the large repeat transactions at Guru Food indicated trafficking. *Tony's Pantry Mart Inc.*, 2017 WL 5141184, at *5.

All five of the households FNS examined for conducting suspicious transactions at Guru Food also shopped at larger, better-stocked stores during the review period. It would be one thing if these transactions at Guru Food, made after the households' trips to larger, better-stocked stores, were closer in dollar amount to the Wisconsin convenience store average of around $7.00. (A.R. at 181.) That would explain shoppers who forgot an item or two at the larger stores and, rather than go back to the larger stores, went to the closer Guru Food to retrieve the forgotten item. But the transactions that these

five households made at Guru Food within 24 hours of visiting larger, less expensive stores were too large and too frequent to be explained away as simple, forgotten-item purchases. (A.R. at 182-85.) For example, FNS found that on six different occasions during the review period that "Household #1" conducted transactions in excess of $40.00 at Guru Food within 24-hours of conducting transactions at a small or medium grocery store or superstore. (A.R. at 182.) Similarly, on a single day Household #2 visited a "Pick 'N Save" superstore at noon, where it purchased $29.42 in groceries, and then made a $40.00 transaction at Guru Food at 4:30 p.m., another $30.00 transaction at Guru Food at 7:15 p.m., and another $35.00 transaction at Guru Food at 9:05 p.m. (A.R. at 183.) The data pulled by FNS from these five households reveals dozens of these suspicious combinations of transactions. On this basis, the court agrees with FNS's conclusion that these large transactions are likely trafficking.

As stated above, "[u]nder the applicable law" a retailer disqualified from SNAP due to a trafficking accusation "is essentially required to prove his innocence" when facing a motion for summary judgment. *Onukwugha*, 2013 WL 1620247, at *5; *DWN Inc. v. United States*, No. 16-CV-431, 2017 WL 7053757, at *2 (E.D. Wis. Oct. 25, 2017) ("[S]tore owners must essentially prove their innocence."). This requires the disqualified retailer to "raise material issues of fact as to each of the transactions set forth as suspicious by FNS." *Tony's Pantry Mart Inc. v. United States*, 2017 WL 514184, at *5 (internal citations

omitted). This steep burden is justified by a statutory scheme that requires "permanent disqualification … on 'the first occasion' of [] trafficking." *Id.*

While Guru Food's general observations about its customers' shopping habits and the practice of sharing one EBT card within a household might account for some of the transactions flagged by FNS, they do not account for them all. Take, for example, the transactions flagged by FNS from its examination of Household #4 during the review period. On ten different occasions during the five-month review period that household conducted large EBT transactions at Guru Food within 24 hours of conducting EBT transactions at superstores Walmart Supercenter or Sam's Club. (A.R. at 184.) On September 17, 2019, Household #4 made a $98.95 purchase at Guru Food and, several hours later, made an eleven-dollar purchase at Walmart. (A.R. at 184.) Four days later, Household #4 spent $49.80 at Guru Food and, two hours later, sixty-seven cents at Walmart. (A.R. at 184.) A couple of months later, Household #4 spent $29.00 at Walmart and, one hour later, $49.90 at Guru Food. (A.R. at 184.) A month after that, Household #4 spent seventy-eight cents at Walmart and $50.00 two hours later at Guru Food. (A.R. at 184.) There are six other such examples from the five-month review period of Household #4 conducting a transaction at a large, less expensive, well-stocked superstore and, within twelve hours, spending roughly or exactly $50.00 of SNAP benefits at Guru Food. (A.R. at 184.) None of Guru Food's general explanations addresses these flagged transactions.

As such, it has failed to meet its burden of proving by a preponderance of the evidence that this pattern of suspicious transactions is not the result of trafficking.

In sum, while Halimey's testimony about his practice of extending credit to regular customers raises a genuine factual dispute as to whether the back-to-back transactions were instances of trafficking, Guru Food's explanations fail to sufficiently account for all the suspicious activity highlighted by FNS in its final decision. *See Tony's Pantry Mart Inc.,* 2017 WL 5141184, at *5; *Kahin v. United States*, 101 F. Supp. 2d 1299, 1303 (S.D. Cal. 2000); *AJS Petroleum, Inc. v. United States*, 2012 WL 683538, at *6 (D. Md. Mar. 1, 2012). Guru Food has therefore failed to sustain its burden to show that it did not engage in trafficking during the review period. *See Onukwugha*, 2013 WL 1620247, at *10. The court will therefore grant the United States summary judgment on FNS's trafficking determination.

### 3.2. Penalty

On September 28, 2020, FNS issued its Final Agency Decision reaffirming that there was sufficient evidence to permanently disqualify Guru Food from further participation in SNAP. (A.R. at 291-304.) With respect to its denial of a CMP, FNS stated the following:

> The Retailer Operations Division determined that [Guru Food] was not eligible for a CMP because there was insufficient evidence to demonstrate that the firm had established and implemented an effective compliance policy and program prior to the SNAP violations in this case. For example, there were no training logs, training agendas, signed training certificates, or any other documentary evidence showing that SNAP training was provided to its employees.

Counsel contends that a store of this size does not have employee manuals, training manuals, or pre-determined dates for review of policies and procedures with its one employee. However, the fact that there may only be one other employee of the firm does not excuse [Guru Food] from documenting its training program. The Retailer Operations Division's decision not to impose a trafficking CMP in lieu of disqualification is sustained as appropriate under 7 CFR § 278.6(i).

(A.R. at 303.)

Both Guru Food and the United States have moved for summary judgment on the issue of whether FNS's decision to permanently disqualify Guru Food from SNAP was an appropriate penalty given the store's trafficking charge. Guru Food argues that it met its burden of establishing its eligibility for a CMP in lieu of permanent disqualification and that FNS's refusal to consider the lesser penalty was arbitrary and capricious. (ECF No. 36 at 15.) It alternatively argues that it should not be precluded from a CMP because it did not receive fair notice of what was required to prove its eligibility for the lesser penalty.

The United States argues that Guru Food failed to meet the requirements necessary to prove its CMP eligibility. Therefore, FNS's decision to permanently disqualify the store from further participation in SNAP was well within the agency's discretion. The United States also argues that Guru Food cannot claim it lacked fair notice because Singh, as owner and operator of Guru Food, signed and agreed to the terms of the SNAP Retailer Application, and thereby certified that she was responsible for ensuring the store's

compliance with SNAP policies. It was incumbent upon her to seek out the information necessary to ensure the store's compliance.

"If the Court concludes that there was a trafficking violation, it must give deference to the penalty imposed by the FNS and may only overturn the imposed penalty if it is arbitrary and capricious." *Tony's Pantry Mart Inc.*, 2017 WL 5141184, at *4 (citing *Estremera v. United States*, 442 F.3d 580, 585 (7th Cir. 2006); *Brooks v. United States*, 64 F.3d 251, 256 (7th Cir. 1995); *McGlory v. United States*, 763 F.2d 309, 311 (7th Cir. 1985) (per curiam)). "[A]n agency's action is arbitrary and capricious only if it is unwarranted in law or without justification in fact." *Id.* at *7 (quoting *J.C.C. Good & Liquors v. United States*, No. 96 C 6461, 1997 WL 55960, at *5 (N.D. Ill. Feb. 7, 1997)). "A sanction is not arbitrary and capricious when a federal agency properly adheres to its own regulations and guidelines when imposing it." *Id.* (quoting *Young Jin Choi v. United States*, 944 F. Supp. 323, 325 (S.D.N.Y. 1996)).

Title 7 C.F.R. § 278.6(i) provides certain criteria that a store must establish by substantial evidence to be eligible for a CMP in lieu of permanent disqualification. To qualify for a CMP, Guru Food—within ten days of receiving the Charge Letter—needed to put forth substantial evidence showing that: (1) it developed an effective compliance policy as specified in 7 C.F.R. § 278.6(i)(1); (2) both its compliance policy and program were in operation prior to the occurrence of the violations cited in the Charge Letter; (3) it had developed and instituted an effective personnel training program as specified in 7

C.F.R. § 278.6(i)(2); and (4) Singh was not aware of, did not benefit from, and was not in any way involved in the trafficking violations. (A.R. at 303 (citing 7 C.F.R. § 278.6(i)).) Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Butler v. Barnhart*, 353 F.3d 992, 999 (D.C. Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

Because the court determined that Guru Food failed to meet its burden of disproving the trafficking charge, FNS's decision to permanently disqualify the store can be overturned only if this court finds that it was "unwarranted in law or without justification in fact." *See Tony's Pantry Mart Inc.*, 2017 WL 5141184, at *7. As such, for Guru Food to survive the United States' summary judgment motion, it must at a minimum demonstrate that there is a genuine issue of material fact as to FNS's findings on *each* of the three CMP eligibility criteria which FNS found it failed to satisfy.

Guru Food relies on *Ahmed v. United States*, 47 F. Supp. 2d 389 (W.D.N.Y. 1999), for its argument that FNS erred in finding it was not eligible for a CMP. (ECF No. 36 at 10-15.) It cites to *Ahmed*, "not for similarity in facts, but as guide to a reasoned, balanced and logical analysis by a Court to criteria 1, 2 and 3 in 7 C.F.R. § 278.6(i) when a small store owner is involved." (ECF No. 47 at 2.) Put differently, Guru Food relies on *Ahmed* for the proposition that FNS should account for a store's size and location when assessing whether a store's evidentiary proffer is sufficient to show CMP eligibility. (ECF No. 36 at 10-15.)

In *Ahmed*, the court noted that,

> [a]lthough the regulatory criteria for establishing eligibility for a CMP "appear[] to favor written documentary evidence of the compliance policy," the regulations also allow the Agency to … consider: 1) "[t]he nature and scope of the violations charged against the firm"; 2) "[a]ny record of previous firm violations under the same ownership or management"; and 3) "[a]ny other information the firm may present to FNS for consideration."

*Ahmed*, 47 F. Supp. at 396 (first citing *Castillo v. United States*, 989 F. Supp. 413, 418 (D. Conn. 1997; and then citing 7 C.F.R. § 278.6(i)(iv)-(vi)). Guru Food argues that it provided FNS with substantial evidence demonstrating that it had an effective compliance policy in place at the time of the violations, but FNS unfairly discounted the evidence because it was not the sort of organized, dated, and documented evidence the regulations call for. Specifically, it argues that FNS "failed to consider" Singh's affidavit, in which she averred, among other things, that the store's EBT policy at all relevant times was displayed prominently at the store's counter "and [was] viewable by [Halimey] at all times," that she had explained the store's policy and the consequences of not following it to Halimey, and that she reviewed the policy "at least once a month" with Halimey. (ECF No. 36 at 11-12.) Guru Food also contends that "FNS refused to consider that neither [Singh] nor the Store had any violations prior to the Alleged Violations Period" when determining whether Guru Food had satisfied its burden under Criterion 1 and 2. (ECF No. 36 at 11 (citing ECF No. 46 at ¶ 4).)

In response, the United States first argues that "*Ahmed* is so factually distinct from the instant matter as to render the comparison meaningless." (ECF No. 45 at 3.) First, in *Ahmed* FNS permanently disqualified a convenience store based on a single transaction in which an FNS investigator exchanged $100.00 worth of food stamps in exchange for $50.00 in cash. *Ahmed*, 47 F. Supp. 2d at 390. Here, FNS's decision to permanently disqualify Guru Food was the result of a five-month investigation during which the agency uncovered dozens of suspicious transactions. (ECF No. 30 at ¶¶ 17-26.) Second, the administrative record in *Ahmed* revealed that FNS relied on several erroneous factual findings when determining permanent disqualification was necessary, including findings that the store had committed multiple violations instead of just one, that the plaintiff had failed to timely submit its materials establishing eligibility for a CMP, and that management was involved in the violation. *Ahmed*, 47 F. Supp. 2d at 393-95. FNS's reliance on these "disturbing" factual inaccuracies led the court to conclude that FNS likely lacked a sufficient factual basis to permanently disqualify the store from the Food Stamp Program. *Id.* at 393.

Guru Food does not argue that the record contains such factual errors as to render FNS's penalty decision arbitrary and capricious. Rather, it argues that FNS failed to properly weigh Guru Food's proffered evidence when deciding whether the store was CMP eligible. (ECF No. 36 at 10-15.)

24

The court in *Ahmed* determined the plaintiff would likely prove that its permanent disqualification was arbitrary and capricious because FNS rested its disqualification decision on gross factual inaccuracies. *Ahmed*, 47 F. Supp. 2d at 400. But FNS relied on no such factual inaccuracies in this case. While Guru Food claims that it cites to *Ahmed* not for its factual similarities but for its approach to assessing the CMP criteria when the subject is a small convenience store in a low-income area, it ignores the fact that the *Ahmed* court relied on FNS's factual inaccuracies in reaching its conclusion. As such, the court is not persuaded by Guru Food's argument that it should alter the store's evidentiary burden for demonstrating CMP eligibility under 7 C.F.R. § 278.6(i).

Contrary to Guru Food's suggestions, FNS did not "ignore" Singh's affidavit but found that the store failed to satisfy three of the four necessary criteria "precisely as a result of considering Ms. Singh's first affidavit" and accompanying materials. (ECF No. 45 at 5.) FNS's Case Sanction Recommendation Report thoroughly explains why Singh's submissions—*i.e.*, a letter to establish Guru Food's eligibility for a CMP, Singh's affidavit, and copies of the store's SNAP policy (A.R. at 253)—failed to establish Criterion 1 and 2:

> [**Criterion 1.**] The subject store provided a copy of what appears to be a version of SNAP rules and regulations available as part of Retailers Training Guide. While this is a FNS resource suggested as part of a retailer's ongoing training program, displaying it alone does not meet the standards of an effective compliance policy.

> The subject store must submit written and dated statements of internal policy that reflect a commitment to ensuring that the firm is operated in a manner consistent with SNAP regulations and policy. This should include the compan[y's] policy on how to deal with any violations, how to deal with

any complaints, and how internal reviews of employees will be performed. The subject store provided a copy of some of the rules and regulations governing the SNAP program[;] however, they provided no actual written policy that reflects a commitment to the SNAP guidelines for review[.] [T]herefore, Criterion 1 has not been met….

[**Criterion 2.**] The subject store must establish[] that both its compliance policy and program were in operation <u>prior</u> to the occurrence of violation. FNS acknowledges retailer's affidavit[;] however, it is dated April 23, 2020, after the violations occurred. The retailer did not submit any documentation [to show] that a training program was in fact in place prior to the violations occurring.

(A.R. at 257-58).

The Case Sanction Recommendation Report demonstrates that FNS reviewed Guru Food's submissions and provides clear explanations for why the submissions failed to establish the first two criteria necessary for CMP eligibility, as outlined in the compliance policy standards listed in 7 C.F.R. § 278.6(i)(1). The report explains that, although an FNS resource, the document submitted as Guru Food's "Store EBT Policy," by itself, "does not meet the standards of an effective compliance policy." (A.R. at 257.) Quoting the relevant regulations, the report explains that Guru Food was required to "submit written and dated statements [which] reflect a commitment to ensure that the firm is operated in a manner consistent with SNAP regulations and policy." (A.R. at 257 (quoting 7 C.F.R. § 278.6(i)(1)).)

Turning to the second criterion, the Case Sanction Recommendation Report "acknowledges" Singh's affidavit but explains that, because the affidavit "is dated April 23, 2020, after the violations occurred," it is not sufficient proof that Guru Food's

"compliance policy and program were in operation … *prior* to the occurrence of [the

Charge Letter's cited] violations." (A.R. at 257-58 (citing 7 C.F.R. § 278.6(i)).) Again, the

report demonstrates that FNS adhered to its own polices and regulations and provided

detailed explanations for why Guru Food's submissions were insufficient.

Guru Food relies heavily on the *Ahmed* opinion for its argument that the proof

necessary for the third criterion "is onerous and unrealistic when applied to a small

business with only one or two employees" and that its "elaborate requirements … seem

unsuitable for a one-clerk store in a low income trade area." (ECF No. 36 at 12 (quoting

*Ahmed*, 47 F. Supp. 2d at 397).) Quoting the regulations, FNS noted in its report that

> [t]raining documentation [pursuant to Criterion 3] must include:
>
> a. a record of the materials reviewed
> b. the name of the owner(s) and employee(s)
> c. dates of employment for all store personnel
> d. the dates of training for all store personnel
> e. the signature of the owner(s) and employee(s) attesting to their SNAP
>    training[.]

(A.R. at 259 (quoting 7 C.F.R. § 278.6(i)(2).) FNS acknowledged Singh's affidavit and her

relevant averments but explained that Guru Food "did not provide any of the [listed]

training documentation and information." (AR at 259.) While the third criterion's

evidentiary requirements are perhaps a bit rigid and demanding when applied to a store

of Guru Food's size, FNS simply adhered to its regulations and policies when

determining that Singh's affidavit "f[ell] short of meeting the standards of an effective

personnel training program." (A.R. at 259.) And FNS's conclusion was not based on any factual inaccuracies.

In evaluating whether Guru Food's submission was sufficient to meet the fourth criterion, FNS accepted as true Singh's averment that she "had no knowledge of, did not approve of, nor benefit from violations cited" in the Charge Letter. (A.R. at 260 (citing 7 C.F.R. § 278.6(i)).) FNS thus found that Guru Food had satisfied Criterion 4. (A.R. at 260.)

"A sanction is not arbitrary and capricious when a federal agency properly adheres to its own regulations and guidelines when imposing it." *Tony's Pantry Mart Inc.*, 2017 WL 5141184, at *7 (internal citation omitted). That is precisely what FNS did when it determined that Guru Food's submissions fell short of satisfying the first three criteria for establishing CMP eligibility. And, contrary to Guru Food's claims, FNS considered the store's proffered evidence and explained why it was insufficient to meet the requirements outlined in 7 C.F.R. § 278.6(i).

The United States points out that the provisions outlined in 7 C.F.R. § 278.6(i)(1)(iv)-(vi)—which Guru Food contends FNS ought to have considered given that Guru Food, like the store in *Ahmed*, is small and has only one non-family employee—"are *discretionary*." (ECF No. 45 at 7 (citing 7 C.F.R. § 278.6(i)(1)(iv)-(vi)).) Therefore, FNS's decision to omit them from its Case Sanction Recommendation Report does not render its decision to permanently disqualify Guru Food arbitrary and capricious. Moreover, even where FNS determines that a retailer has put forth substantial evidence

demonstrating that it had an effective compliance policy and program prior to the violation, FNS's decision to impose a CMP in lieu of permanent disqualification is discretionary. *See Saleh v. United States*, No. 02 C 8846, 2004 WL 549457, at *3 (N.D. Ill. Mar. 19, 2004) ("Even if [the retailer] did have such a policy in place, however, the administrative agency still would have had the discretion not to deviate from the mandated penalty of permanent disqualification." (citing *Brooks v. United States*, 64 F.3d 251, 256 (7th Cir. 1995); *Traficanti v. United States*, 227 F.3d 170 (4th Cir. 2000); *Goldstein v. United States*, 9 F.3d 521, 523 (6th Cir. 1993))).

Finally, Guru Food claims that it "never received any information relating to the civil monetary penalty, or the need to implement an effective compliance policy and program to prevent violations of SNAP." (ECF No. 36 at 15.) Therefore, it argues that a CMP in lieu of permanent disqualification is appropriate because "a small retail food store with one employee" cannot be expected to have met the "requirements set out in the regulations regarding documenting an effective compliance program" without first receiving fair notice of those requirements. (ECF No. 36 at 15-18.)

Guru Food's assertion that FNS failed to provide it with fair notice of the CMP criteria is questionable given that its EBT policy is an excerpt from the SNAP Training Guide for Retailers, which provides an explanation of CMP and provides resources for additional information. (A.R. at 254-257; ECF No. 38 at 19-21.) In any event, it does not excuse it from meeting those criteria in the event of a trafficking charge. It is undisputed

that Singh, as the owner of Guru Food, signed the store's SNAP Retailer Application on

January 12, 2014. (ECF No. 30 at ¶¶ 8-11.) It is further undisputed that the SNAP Retailer

Application contains the following language:

> By signing below, you are confirming your understanding of and
> agreement with the following: … I will receive Supplemental Nutrition
> Assistance Program training materials upon authorization. It is my
> responsibility to ensure that the training materials are reviewed by all firm's
> owners and all employees …; and that all employees will follow
> Supplemental Nutrition Assistance Program regulations. *If I do not receive
> these materials I must contact the Food and Nutrition Service to request them*[.]"

(A.R. at 20 (emphasis added).) Thus, by signing the SNAP Retailer Application, Singh not

only certified that she was responsible for ensuring that her employees reviewed the

SNAP training materials and adhered to SNAP regulations, but also that she would reach

out to FNS to request the training materials if she did not receive them.

The SNAP Training Guide for Retailers, which the United States provided in a

supplemental response to Guru Food's May 2021 request for discovery (ECF No. 38 at Ex.

B), outlines a SNAP retailer's duties and obligations, as well as the penalties for failing to

follow SNAP guidelines, including the associated penalties for trafficking. The Training

Guide also includes a hotline number for assistance on SNAP compliance and directs

retailers to a set of online training videos via a URL address. (ECF No. 46 at 6, ¶¶ 3, 5.) A

video entitled "Basic Guidelines for SNAP Retailers" gives the following guidance on

CMP eligibility:

> You must be able to demonstrate that an established compliance program
> and policy is in place at your store to prevent SNAP violations from

> occurring. At a minimum an acceptable SNAP training program has three parts: (1) SNAP training within 30 days of employment for each person; (2) Annual SNAP training for everyone; and (3). Ongoing review of Program rules and guidance (such as this video). Documentation for both the initial and refresher training must include a record of the materials reviewed; name of the owners and employees; date of employment; date of training and signatures of the owner's and employee's attesting to their SNAP training. Ongoing Review of Program Rules and FNS Training Materials. When changes in the Program are announced by FNS you should ensure that everyone learns them.

(ECF No. 46 at 6, ¶ 6.) This readily available guidance and Guru Food's affirmative duty "to ensure that the training materials are reviewed by all firm's owners and all employees" and to "contact the Food and Nutrition Service to request" the training materials, undercuts Guru Food's argument that its proclaimed lack of fair notice excuses it from satisfying the criteria necessary to show CMP eligibility.

In sum, because FNS adhered to its regulatory criteria in evaluating Guru Food's submissions in support of a CMP, and because Guru Food does not claim that FNS relied on any factual inaccuracies in denying it a CMP, this court cannot conclude that FNS's decision to permanently disqualify Guru Food from SNAP was arbitrary and capricious. Having found that Guru Food has not presented a genuine issue of material fact regarding FNS's decision to permanently disqualify it from SNAP, the court will grant the United States' motion for summary judgment.

**4.** **Conclusion**

For the reasons explained above, the defendant's motion for summary judgment (ECF No. 24) is granted and the plaintiff's motion for partial summary judgment (ECF No. 35) is denied.

**IT IS SO ORDERED.**

Dated at Milwaukee, Wisconsin this 3rd day of November, 2022.

_William E. Duffin_
WILLIAM E. DUFFIN
U.S. Magistrate Judge